IN THE UNITED STATES DISTRICT COURT,

FOR THE MIDDLE DISTRICT OF FLORIDA,

TAMPA DIVISION.


Alonzo K. Jelks

      Petitioner,

v.

The Clearwater Police Department,

Sergeant Main, Head of K9 Department

      Respondents


## **Complaint**


Petitioner is suing The Clearwater Police Department for Excessive use of Force under 42 U.S.C. § 1983 and alleges that his 4th and 14th Amendment rights were purposely violated in a way that is objectively unreasonable and demonstrates an unjustified and malicious use of force against an unarmed, subdued individual with no history of violence or gang affiliation.  The planned and executed actions were in direct contradiction to the stated polices on the Clearwater Police Department's website.

## Jurisdiction and Venue

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1343(a)(3) (Civil Rights), as this action seeks redress for the deprivation of rights, privileges, and immunities secured by the Constitution of the United States.

2. Venue is proper in the United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b), because the Defendants reside and/or are found in this district, and a substantial part of the events or omissions giving rise to the claim— specifically the alleged excessive force—occurred in Pinellas County, Florida.

## Statement of Facts

1. On November 7, 2025, a call was made by Nitileyah Parker to the Clearwater Police Department ("CPD") about an alleged domestic violence incident.

2. On November 10, 2025, after coordinating with Ms. Parker, CPD arrived at Ms. Parker's and Mr. Jelks' shared apartment with approximately 15 officers and surrounded the perimeter of 1107 Tuskawilla Drive, Apt 107, where the only reasonable means of escape is towards the street in front of the Apartment Complex, because high walls and gates surround the complex on three sides.

3. The officers planned with Ms. Parker for her to lure him out of the apartment and into her vehicle.

4. In a recorded interview with undersigned Counsel as well as the video she recorded at the scene, Ms. Parker explained that she told the officers on scene that she was concerned about the need for the K9 and told them Mr. Jelks did not own or possess a firearm and was not dangerous.

5. Ms. Parker claimed she was told by police that a plan had already been established and was being executed regardless.

6.  Mr. Jelks was at the apartment, in loose fitting jogging pants and sandals commonly referred to as slides, and at that point had no inclination that police officers had been called.

7.  After getting in the car Mr. Jelks sensed "something was off" and then exited the vehicle that was parked immediately in front of the apartment.

8.  As Mr. Jelks walked back towards the apartment door, he noticed someone wearing all black and a black baseball cap pointing an assault rifle at him, which caused him to panic and flee towards the apartment door, which was locked, and caused him to turn in the other direction where he made it a few steps in front of the apartment next to his.

9.  The K9 ("Mando") was released by Sargeant Main as he ran toward Mr. Jelks, and simultaneously yelled "Police K9, get on the ground!"

10.     Mr. Jelks was immediately seized by K9, in front of the apartment next to his, on the 4 ft of concrete comprising porch space along the ground floor in front of the apartment complex.

11.  Mr. Jelks immediately went to the ground yelling "I am down", rolled to his stomach, and 2 officers immediately got on top of him and put

his arms behind his back as the K9 chewed on his foot for approximately 10 seconds.

12. Seargent Main then released the K9 by pulling him back, waited a few seconds, and then allowed the K9 to bite Mr. Jelks again and continue biting him for additional 12 seconds before giving it a release command and pulling the animal back again.

13. After the K9 was pulled back the officer in the black baseball cap holding the assault rifle approached Mr. Jelks while the other 2 officers were still on top of him, and held the assault rifle against his head as he writhed in agony and the dog continued to growl nearby lunging at him repeatedly until pulled away again as Officer Main called an Ambulance.

14. During this entire time Ms. Parker pleaded with the officers not to shoot him, as captured on her cell phone video.

15. Officer Main then thanked the K9 for his help and then proceeded to say "watch him" as the animal continued to lunge towards Mr. Jelks several times while Seargent Main continued to encourage the dog by repeatedly saying "watch him" and slap Mando on the rear in a clear attempt to rile the animal up, rather than attempt to calm it down.

16. Officer Main then attempts to locate a gun with the dog and then directs other officers, saying "I just wanted to make sure he didn't drop the gun over here" as he tells them where to look because the dog is too excited.

17. Multiple officers on the scene later discuss that they all agree they saw him reach in his waistband in an attempt to create a justification for what had just occurred in the absence of a weapon, or drugs, or anything else illegal.

18. Mr. Jelks continued to ask officers on scene why he had been arrested, to which the officers' only response was a question asked repeatedly, "Why did you run?"

19. The officers continued to refuse to tell him why he had been arrested as several officers searched the entire surrounding area for a weapon to no avail.

20. Mr. Jelks then turned his attention to Ms. Parker asking, "I knew there was some funny shit going on, you want to put a nigga in jail cuz they don't want to fuck with you no more!? You mad cuz I don't want to give you dick no more!? You Trippin!"

21. The officer who appears to be in charge, approaches Officer Main, and quietly says, "What do we have, obstruction?"

22.     Officer Main replies, "Well, he fled, but.." To which the other officer responds with a smile, "Yeah that's obstruction." To which Seargent Main responds "Well, the dog bit him for a reason."

23.     The officer presumably in charge at the scene is the same one who had spoken to Ms. Parker on scene about her alleged injuries and then asked Sargeant Main if there were any lights or sirens on before he ran, to which Sargeant Main responded "I don't know."

24.     Then the same officer presumably in charge approaches a group of 8-9 officers standing in a circle appearing to be getting their story together, and one of the officers claimed there *was* lights and sirens, although this is not visible or audible in any of the footage given to Counsel.

25.     In another body worn camera ("BWC,") footage it's not clear if it's a continuation of Sargeant Main's BWC while in the ambulance or another officer's BWC, but the video goes blurry and the sound cuts off at various times. But it largely seems to be a continuation of Mr. Jelks asking the officer why he is being arrested and why they didn't just come to the door or something?

26.     The officer in the ambulance continues to ask why he ran instead of answering the question about why they were called in the

first place and then responds to Mr. Jelks that "we knew you were going to run."

27.    The Officer continued, "When you see flashing lights and sirens and hear please stop" to which Mr. Jelks responds "No," but then the audio cuts out before we can hear Mr. Jelks response and then minutes later comes back on with Mr. Jelks saying "Y'all caught me out the blue like that, and all y'all had to do was come talk to me."

28.    After several more minutes the officer in the ambulance informs Mr. Jelks that the officer following behind the ambulance will be able to answer his questions and will then read him his rights.

29.    At the Hospital Mr. Jelks continued to inquire about the reason for his arrest and the officer referenced above had reportedly not arrived according to the officer in the hospital but told Mr. Jelks he was arriving shortly. The BWC video stops before that officer arrives.

30.    Counsel reviewed the video recorded on Ms. Parker's cell phone before requesting BWC footage from Corporal Mills with the CPD.

31.  Obtaining BWC footage was necessary because the entire case is still sealed by the FDLE despite numerous FOIA requests.

32.    What Counsel received was heavily redacted and only a small portion of the relevant evidence.

33.    In total, Counsel received 4 separate BWC videos, 2 of which did not contain any evidence of the scene itself.

34.    On February 24, 2026, Ms. Parker came into Counsel's office for a scheduled interview which she was aware was being recorded.

35.    Ms. Parker admitted to fabricating the entire story to the police by falsely claiming that Mr. Jelks had broken her car window and that there was a physical altercation 3 days prior to the incident on Nov 10, 2025, because she was angry at Mr. Jelks for cheating on her.

36.    Ms. Parker also admitted to following up with the police to plan for his arrest.

37.    Additionally, Ms. Parker freely admitted to counsel in a previous incident, when counsel was with The Public Defender's Office, that she had fabricated the other domestic violence claims and also falsely claiming to be pregnant, seemingly to keep Mr. Jelks in her life after the second of four total false domestic violence calls over a 2-year period.

38.    The latest alleged domestic violence occurred on March 20, 2026, after counsel advised Mr. Jelks to leave their shared apartment,

when Alonzo then returned to her residence to retrieve his belongings without notifying Counsel.

39.     Mr. Jelks had never been convicted of any of the previous domestic violence charges against him, because they were all dropped by the prosecution months after Ms. Parker immediately and invariably submitted a Request not to Prosecute after every alleged incident.

40.     The March 20, 2026, allegation was erroneously charged as a felony domestic battery, presumably based on prior convictions that do not exist on Mr. Jelks' record.

41.  These charges and other highly questionable charges from his past have prevented Mr. Jelks from achieving his dream of joining the military and indicate a directed targeting of Mr. Jelks by members of the CPD since he was a teenager being charged with grand theft auto for joy riding his Aunt's vehicle, and a gun charge based on video evidence that did not show a gun, and for which an attorney was never present at his interrogation, at the age of 18.

42.     As a result of the K9 attack, Mr. Jelks now suffers from severe nerve pain,  sudden numbness in his foot, and a persistent tingling sensation in his toes that prevent him from his normal activities of

daily life including standing on his feet for any extended period of time as required by his jobs, playing sports such as basketball for fear of further injury resulting from sudden loss of feeling, or even being able to sit down without elevating his foot for relief, which is then followed by a tingling sensation.

43.     Moreover, Mr. Jelks appears to be suffering from PTSD in relation to dogs of any kind, something that never affected him before, but which now causes him involuntary and irrational fear at the sight or sound of any dog, as observed by Counsel.

44.     Additionally, Counsel has tried to reach all relevant departments in the CPD several times via phone and email with the intent of providing every opportunity for this to be resolved in an efficient and non-public manner with no response over the course of a month before finally leaving another voice message with the Chief's office late in the day on Friday March 13, 2026, explaining that the media would be involved if Counsel continued to be stonewalled.

45.     Counsel then immediately received calls on both his personal cell and his business line with voice messages to call back and talk to the Chief's assistant, Susan.

46.     Counsel immediately returned Susan's call, and she informed Counsel that he would be receiving a call from the correct department by the following Monday or Tuesday.

47.     Counsel waited until Thursday morning to call back, again no answer and no return call.

48.      Counsel received an email from Susan the following day on Friday explaining that I need to contact the risk management department for more information, which counsel had already attempted to contact on multiple occasions by phone and email, and which had already been explained to Susan on the phone in no uncertain terms.

49.     The same day, Friday, March 20, 2026, Ms. Parker had already called the CPD again, after Mr. Jelks returned to her apartment to attempt to retrieve his belongings, to no avail.

50.     Mr. Jelks was arrested later that day from his grandmother's house and charged with felony domestic battery and loitering.


**WHEREFORE**, Alonzo Jelks humbly requests judgment against Defendants, The Clearwater Police Department, and Sargeant Main for compensatory damages, along with costs of this action, pre-judgment

interest, reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and such other relief as this Court deems just and proper, resulting from the violation of Plaintiff's rights under the Fourth and Fourteenth Amendments of the U.S. Constitution and Florida law.

Additionally, Mr. Jelks requests punitive damages for the unreasonable and malicious nature of the incident on November 10, 2025, and the campaign against his rights over a course of years either resulting from gross negligence in the operation of duties or actual malice resulting from the "reputation" he was told he had developed with the CPD based on highly questionable charges and false domestic violence charges that have consistently been dropped by various State's Attorneys.

Respectfully Submitted,

*Joshua Bethea*

Joshua Bethea, JD, LLM
FL Bar Number: 1063980
Joshua@JoshuaBethealaw.com
10300 49th Street North, Unit 109
Clearwater, FL 33762
727.337.7447